[Cite as *State v. Watts*, 2020-Ohio-3282.]

## COURT OF APPEALS OF OHIO

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,              :

                                     No. 108707

v.                                       :

GREGORY WATTS,                          :

    Defendant-Appellant.            :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** June 11, 2020

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-18-627798-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Kevin R. Filiatraut, Assistant Prosecuting Attorney, *for appellee.*

Christopher M. Kelley, *for appellant.*

MARY J. BOYLE, P.J.:

{¶ 1} Defendant-appellant, Gregory Watts, appeals his convictions and sentence. He raises four assignments of error for our review:

1. Appellant's convictions are against the manifest weight of the evidence.

2. Appellant's convictions are not supported by sufficient evidence.

3. The trial court erred in failing to merge appellant's kidnapping and aggravated murder convictions as allied offenses of similar import.

4. Appellant was denied the effective assistance of counsel when trial counsel stipulated that appellant's kidnapping and aggravated murder convictions were not allied offenses of similar import.

{¶ 2} Finding no merit to his appeal, we affirm.

## I. Procedural History and Factual Background

{¶ 3} In April 2018, Watts was indicted on six counts: Count 1, aggravated murder in violation of R.C. 2903.01(B); Count 2, aggravated murder in violation of R.C. 2903.01(A); Count 3, aggravated burglary in violation of R.C. 2911.11(A)(1); Count 4, kidnapping in violation of R.C. 2905.01(A)(3); Count 5, murder in violation of R.C. 2903.02(B); and Count 6, felonious assault in violation of R.C. 2903.11(A)(1). Watts waived his right to a jury trial, and the case proceeded to the bench. The state informed the trial court that it was proceeding on alternate theories that Watts was complicit in the crimes or was the principal offender. The state presented the following evidence to the trial court.

{¶ 4} In the early morning hours of March 6, 2018, the victim in this case was beaten to death in the home of Steven Dabrowski. The victim had been living with Dabrowski for approximately one year before her death. Dabrowski discovered the victim's body in his laundry room when he arrived home from work around 1:45 p.m. that day. The medical examiner said that the victim had been dead for several

hours when she was found. The victim had been beaten so badly that her facial bones had separated from her skull bones. She also had injuries all over her body, including defensive injuries to the back of her left hand and wrist. The medical examiner testified that the victim had several drugs in her system when she was killed, including enough fentanyl in her blood that it could have killed her, but he said that was not the cause of her death. The medical examiner ruled her death to be a homicide as a result of blunt force trauma to her neck and head.

{¶ 5} Dabrowski stated that when he left for work around 4:30 a.m., he thought he saw the victim sleeping under some blankets on the couch. But he admitted that he only saw the blankets and did not actually see the victim. Dabrowski worked at the post office in downtown Cleveland and normally left for work around that time. When he got home from work, the door to his house was locked. The victim had a key to his house, so he did not think anything of the door being locked. He said that there were no signs of forced entry into his home. Dabrowski discovered that his 32-inch television and two cameras were missing. The victim's key to Dabrowski's house was never found.

{¶ 6} Police obtained surveillance footage from a nearby business for the hours of 4:00 a.m. to 2:00 p.m. on March 6, which showed Dabrowski's vehicle leaving his home at the time he said he did and returning at the time he said he returned. Dabrowski called 911 soon after arriving home. Police also swabbed and photographed Dabrowski's hands, which had no injuries on them. They also towed

his vehicle and processed it for evidence, eventually eliminating Dabrowski as a suspect.

{¶ 7} The surveillance footage further showed that approximately two minutes after Dabrowski left for work, at 4:35 a.m. on March 6, another vehicle pulled into his driveway. The footage shows that vehicle leaving Dabrowski's house at 5:48 a.m. Police were never able to determine what kind of vehicle pulled into Dabrowski's house at 4:35 a.m., although they attempted to do so. All they could determine was that it was a "boxy" vehicle. Based upon the surveillance footage and the medical examiner's conclusion that the victim had been dead for at least several hours, police surmised that the victim was killed between 4:35 a.m. and 5:48 a.m.

{¶ 8} Detective Raymond Diaz, the lead detective assigned to the case, testified that he and his partner, Detective Jody Remington, arrived at the scene around 2:30 p.m. on March 6. Police officers from the crime scene investigation unit took photos of the crime scene and gathered evidence.

{¶ 9} Detective Diaz and Detective Remington investigated other suspects after they eliminated Dabrowski, including the victim's boyfriend, Thomas Maczadlo. Police also investigated Ricardo Dean (also known as "JR") and his associate, Donnell Palmore. Detective Diaz testified that police received an anonymous call from a woman who told them that Dean punched her and threatened her that if he caught her buying drugs from someone else, he would "kill her like [the victim]." Dean also drove "an older-style white mini-van," which was similar to the "boxy" vehicle they saw on the surveillance footage. Despite this tip

and the "older-style white mini-van," Detective Diaz said that they eliminated Dean because his DNA was not found at the scene and they could not find any connections relating Dean to the victim. Police also ruled out Palmore as a suspect.

{¶ 10} Detective Diaz explained that two days after the victim was murdered, he received another anonymous tip. The tipster turned out to be Terry Harrah. As a result of the tip, Detective Diaz spoke with Terry Harrah and Michella Belle.

{¶ 11} Belle testified that she had known Watts since 2010. Around the time of the victim's murder, Belle said that Watts was living with her part-time. She said that when he was not at her house, he stayed at empty houses that he was painting. Belle testified that Watts was "the best friend [she] ever had" in her "whole 59 years." Belle stated that Watts was a "wonderful person, * * * kind and lovable," whether he was "high or sober." Belle loved Watts and she "never" wanted to "see anything bad happen to him."

{¶ 12} Belle testified that Watts was at her house and trying to leave so that he "could get high." Although Belle did not state when this happened, other evidence established that it was the evening of March 6, 2018. Belle testified that she was "trying to block him and hold him in the house." She said that Watts told her that he "killed a girl." She said that although she did not know that a woman had been murdered, it had been on the news and "most people knew about it." She said Watts "just threw that up in the air" to get out of her house. After he told her that he "killed a girl," he left. After he left, she saw on the news that a woman had been murdered.

{¶ 13} Belle stated that she did not believe Watts when he said that he killed someone. She said that he would not do something like that.

{¶ 14} After Watts left her house, Belle called Terry Harrah, who was one of Watts's bosses. She said that Watts is a painter and works "with a lot of different people painting houses." Belle testified that she called Harrah because he was worried that he had not seen Watts for a couple of days. Belle explained that it was normal for Watts to disappear for several days. Belle stated that she also called Harrah because she knew that Harrah and Watts were close; Watts always told Belle that Harrah was "like family to him." Belle testified that she felt bad that she told Harrah what Watts told her because if she had not done so, then she would not have to testify "against [her] great friend."

{¶ 15} Belle testified that a few days later, Watts came back to her house and told her that he did not kill anyone. Belle said that Watts told her that he was just trying to get out of her "house to get high." Belle stated that she did not call police because she did not believe that Watts murdered anyone, and Watts "cleared it up and said he didn't do it."

{¶ 16} Belle testified that about a week after Watts told her that he "killed a girl," he went into "rehab."

{¶ 17} Belle stated that she had talked to Watts since he had been in jail. She agreed that Watts told her that she did not have to go to court to testify against him, but Belle said that Watts only told her that because he was worried about her health because she is "a very sick person."

**{¶ 18}** Belle did not know the victim or Demetrius Smith (whose DNA was found on the victim's left hand).

**{¶ 19}** Belle testified that when police interviewed her, she told them that she did not want to be involved in the case. She stated that she told police that because she did not know what happened and she did not "want to be a part of hurting [her] good friend, Gregory Watts." She "prayed to god" that her testimony did not hurt Watts.

**{¶ 20}** Harrah testified that he has been a painting contractor since 1985. At the time of trial, he was working a job in Philadelphia, Pennsylvania. He drove to Ohio to testify in Watts's trial. When he was done testifying, he was going to drive back to Philadelphia to complete his job.

**{¶ 21}** Harrah stated that he had known Watts since the 1980s, soon after Harrah started working. Harrah said that he considered Watts to be "his best friend." Harrah stated that Watts was an "excellent" worker. When he needed Watts for a job, Harrah would "track him down in the neighborhood." Harrah said that Watts was not technically his employee, but Harrah would pay him to do a job. Harrah rated Watts a "15" as a worker on a scale of one to ten. Harrah "was not very happy" about testifying in Watts's trial.

**{¶ 22}** Harrah testified that Watts had a "crack cocaine" problem. Watts had admitted it to him.

**{¶ 23}** Harrah said that he lived in Florida. Over the years, he and Watts had "dinner a couple of times down in Florida," but Harrah said that he does not

normally "fraternize like that."  Harrah explained that he had helped Watts in the past when he got in trouble, including paying Watts's bond to get out of jail, giving him money when he needed it, and finding more work for him.

{¶ 24} Harrah testified that in early March 2018, he was working on a project in Willoughby and Mentor.  Harrah said that Watts worked with him on both projects.  He said that although Watts was "a solid man," Watts had not been himself during the two weeks before the murder.  Harrah could tell that Watts's "crack usage" was up, and although Watts was still performing on the job, he appeared to be "very tired" and not thinking properly.  Harrah said that Watts had "a lot of slip-ups" during that time.

{¶ 25} Harrah knew that Watts was "staying" with Belle.  Harrah was not friends with Belle, but she was an acquaintance of his.  Harrah said that Watts gave Belle's phone number to Harrah so that Harrah could get in touch with Watts "when [Watts's] phone would disappear."

{¶ 26} Harrah said that he bought Watts's cell phone for him.  Harrah stated that Watts's phone would disappear sometimes.  Harrah figured that when Watts purchased crack cocaine, he would give the dealer his phone to get more drugs.  Harrah explained that he had purchased five phones for Watts in the previous six to eight months, all under Watts's name, and they all disappeared.

{¶ 27} Harrah testified that he had not be able to find Watts around the time of the murder.  He called Watts's phone at least 3o times and did not receive an answer.  Harrah then called Belle to ask her if she had seen him.  Three days later,

Belle called Harrah. Harrah said that she was very upset. She told him what Watts had said to her and gave her the victim's name. He did not think anything of it until, as Belle told him the victim's name, his significant other saw on Facebook that the victim had been murdered.

{¶ 28} The next day, on March 7, 2018, Harrah said that he picked Watts up at a house on "Maurice off of East 55th." He had picked Watts up from this house in the past. At some point that day, he spoke with Watts about the murder. Harrah was "mortified." Harrah told Watts to "level with [him]" and asked him, "What the hell is going on here?" Harrah testified that Watts told him, "We fucked the bitch up." Harrah asked him why. Harrah said that Watts replied, "Took my phone and my money, and it's happened on more than one occasion." Harrah said that he could tell by Watts's "body language, his attitude, and everything else" that "something was wrong." He then continued to work with Watts and talk to him about what had happened. Harrah said that based on Watts's answers, he knew that Watts had killed the woman. Harrah eventually told Watts that they were "done" and that he never wanted to see him again. Harrah stated that it was "very difficult" to say that to Watts because he cared about him.

{¶ 29} Harrah testified that he knew that he had to call the police. He said that he told Detective Diaz everything that he knew.

{¶ 30} On cross-examination, Harrah agreed that if Detective Diaz's summary report of his interview with Harrah stated that Harrah told him, "The bitch did me wrong," and not, "We fucked the bitch up," that the report was probably

correct. Harrah testified, "To me, they both sound the same." Harrah agreed that Watts admitted to killing the victim on March 7, 2018, but that the next day, on March 8, Watts denied being involved in the homicide.

{¶ 31} After speaking with both Harrah and Belle, Detective Diaz obtained an arrest warrant for Watts. Detectives Diaz and Remington interviewed Watts. Watts denied that he killed the victim but admitted that he did drugs with her. He told police that the last time he saw the victim was two days before she got murdered. Watts also told police that his cell phone was stolen before the murder. Watts stated that the last time he saw his phone was the last time he saw the victim, two days before her death. Watts told the detectives that he had been at a house on Maurice Avenue for several days around the time of the murder.

{¶ 32} In September 2018, Detective Diaz testified that they received a CODIS hit on the DNA swab taken from the back of the victim's left hand. It matched that of Demetrius Smith. Smith had gotten out of jail in March 2017 and was arrested on March 8, 2018, in another case. Detective Diaz interviewed Smith on September 19, 2018, the day that Smith was sentenced to nine years in prison for aggravated robbery in another case. Smith denied knowing the victim but admitted that he knew Watts from the neighborhood. Smith gave Detective Diaz several phone numbers, including his, his mother's, and his girlfriend's. Detective Diaz stated that they were still investigating Smith regarding his involvement in the victim's murder.

{¶ 33} Detective Diaz testified that police never found the victim's or Watts's cell phones. Despite that, Detective Diaz obtained cell phone records for Smith, the victim, and Watts. At first, he focused on the time just before and after the murder. He later retrieved cell-tower records for Smith and Watts and cell phone records for Watts from December 2017 to June 2018.

{¶ 34} From these records, Detective Diaz found another phone number that Smith's, Watts's, and the victim's cell phones communicated with frequently. Detective Diaz stated that he tried everything he could to determine who that number belonged to, but he was never able to do so. He stated that he believed it was a "burner" phone that drug dealers use so that police cannot trace who owns the phone. He learned that the burner phone made frequent calls to Smith's mother's cell phone and the cell phone belonging to Smith's girlfriend, who was also the mother of his child. Detective Diaz stated that the burner phone probably belonged to Smith or someone close to him.

{¶ 35} Detective Diaz testified that there was no activity for Watts's, Smith's, or the victim's cell phones between 4:35 and 5:48 a.m. on March 6, 2018. The last call that the victim's phone made was at 4:08 a.m. on March 6, 2018, to Watt's phone. The call lasted 263 seconds. Detective Diaz testified that in the 10 days before the murder, the burner phone communicated with Watts 18 times and the victim 19 times. In the hours before the murder, the burner phone also communicated with Watts's and the victim's phones.

{¶ 36} Detective Diaz explained that the cell phone records also show that on March 5 and March 6, 2018, Harrah tried to call Watts. On March 6, 2018, Belle tried to call Watts at 6:54 a.m. and Harrah tried to call him at 7:14 a.m. Detective Diaz stated that the cell phone records show that Belle and Harrah continued to call Watts most of the day on March 6, 2018.

{¶ 37} Detective Diaz testified that someone continued to use the victim's phone after her death; it called the burner phone at 3:38 and 4:34 p.m. on March 6 and another number that he did not know at 4:08 p.m. that day ("the 338 number"). Detective Diaz learned that a person in jail, Erin Finkl, called the 338 number on March 6, 2018. Detective Diaz obtained the visitor log for Erin Finkl and learned that someone named Frank Webb visited Erin Finkl in jail and used the 338 number as his number on the visitor log. Webb also gave his address as a home on Maurice Avenue, the same address where Watts told Detective Diaz he had been staying around the time of the murder. During the March 6, 2018 phone call from Finkl to Webb, Finkl asked Webb what was going on at the house, and Webb replied that "Greg was there." Detective Diaz was never able to interview Finkl or Webb because they both died of drug overdoses before he was able to talk to them.

{¶ 38} Detective Diaz testified that between December 2017 and May 2018, Watts's phone contacted the 338 number at least eight times, Smith's number 11 times, and the burner phone 19 times.

{¶ 39} Detective Diaz also obtained the cell-tower records for the victim's, Smith's, and Watts's cell phones. They showed that they were bouncing off of the

same cell phone tower a day before the murder and that tower was 0.7 miles from the address on Maurice Avenue.

{¶ 40} The state rested. Watts moved for a Crim.R. 29 acquittal, which the trial court denied. Watts did not present any evidence on his behalf. Watts again moved for a Crim.R. 29 acquittal. The trial court stated that it was having trouble with "prior calculation and design" in Count 2 and that it would reserve judgment on that issue until after closing arguments.

{¶ 41} The trial court found Watts guilty of Counts 1 (aggravated murder), 3 (aggravated burglary), 4 (kidnapping), 5 (felony murder), and 6 (felonious assault). The trial court also found Watts guilty of the lesser-included offense of murder under Count 2 in violation of R.C. 2903.02(A).

{¶ 42} The trial court found that Count 2 merged into Count 1, Count 6 merged with Count 5, and Count 5 merged with Count 1. The state elected for the court to sentence Watts on Count 1. The trial court found that Counts 3 and 4 did not merge. The trial court sentenced Watts to life in prison with parole eligibility after 25 full years of prison for Count 1, 10 years for Count 3, and 10 years for Count 4. The trial court ordered that the sentences for Counts 1, 3, and 4 be served concurrently. The trial court also imposed a mandatory five years of postrelease control for Count 3 and a mandatory five years of postrelease control for Count 4. It is from this judgment that Watts now appeals.

## II. Sufficiency and Manifest Weight of the Evidence

{¶ 43} In his first and second assignments of error, Watts argues that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence. Watts does not contend that the state failed to establish the elements of each offense beyond a reasonable doubt. Rather, in both assignments of error, Watts focuses his arguments on the state's theory of complicity to commit the crimes. Thus, we will limit our discussion to that of complicity.

{¶ 44} "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997), paragraph two of the syllabus. As a matter of appellate review, they involve different means and ends. *Id.* at 386-389. They also invoke different inquiries with different standards of review. *Id.*; *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). The difference, in the simplest sense, is that sufficiency tests the burden of production while manifest weight tests the burden of persuasion. *Thompkins* at 390 (Cook, J., concurring).

{¶ 45} "'[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *Id.* at 386, quoting *Black's Law Dictionary* 1433 (6th Ed.1990). When an appellate court reviews a record upon a sufficiency challenge, "the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable

doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 46} Unlike sufficiency of the evidence, a challenge to the manifest weight of the evidence attacks the credibility of the evidence presented. *Thompkins* at 387. Because it is a broader review, a reviewing court may determine that a judgment of a trial court is sustained by sufficient evidence, but nevertheless conclude that the judgment is against the weight of the evidence. *Id.*, citing *State v. Robinson*, 162 Ohio St. 486, 487, 124 N.E.2d 148 (1955).

{¶ 47} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as a "thirteenth juror." *Id.* In doing so, it must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "'whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983). Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶ 48} R.C. 2923.02 sets forth the statute for complicity. It provides:

(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:

(1) Solicit or procure another to commit the offense;

(2) Aid or abet another in committing the offense;

(3) Conspire with another to commit the offense in violation of section 2923.01 of the Revised Code;

(4) Cause an innocent or irresponsible person to commit the offense.

(B) It is no defense to a charge under this section that no person with whom the accused was in complicity has been convicted as a principal offender.

{¶ 49} The state presented the theory that Watts aided and abetted the principal offender. To prove complicity by aiding and abetting, the state had to prove beyond a reasonable doubt "that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime." *State v. Johnson*, 93 Ohio St.3d 240, 754 N.E.2d 796 (2001), syllabus. The criminal intent of the aider and abettor "can be inferred from the presence, companionship, and conduct of the defendant before and after the offense is committed." *In re T.K.*, 109 Ohio St.3d 512, 2006-Ohio-3056, 849 N.E.2d 286, ¶ 13, citing *Johnson*.

{¶ 50} Watts maintains that the state failed to prove that he had the same criminal intent as the principal offender or that he intended to help the principal offender. Watts asserts that the evidence established that it was Smith who beat the victim and that his DNA was not found anywhere in Dabrowski's home, despite the fact that blood was spattered everywhere.

{¶ 51} As with proof of any element of an offense, complicity may be proved by circumstantial evidence, which has the same probative value as direct evidence. *Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492, at paragraph one of the syllabus. Here,

the state presented evidence that Watts admitted to his friend on the day of the murder that "he killed a girl," and the following day, he admitted the same thing to his boss. When Belle called Harrah to tell him what Watts told her, she gave the name of the victim to Harrah. At the same time that Belle was telling him the victim's name, Harrah's significant other also saw on Facebook that the victim had been murdered and told Harrah about it.

{¶ 52} Watts contends that his remark to Belle was "flippant," and that he only said it to her to get her out of his way so that he could leave her house and get high. But it was clear from the transcript that Belle took Watts's remark very seriously and that she was not happy about testifying against Watts because she did not want him to go to prison. It was also evident from the transcript that after Harrah initially confronted Watts and Watts admitted that "we f*cked the bitch up" or "the bitch did me wrong," that Harrah continued to discuss the matter with Watts throughout the day. Although Harrah could not testify as to what Watts said to him about the murder, Harrah was positive after talking to Watts that Watts took part in killing the victim. Harrah also had a hard time testifying against Watts because he still cared about him.

{¶ 53} Watts further contends that the state focused on "trying to manufacture some kind of link between Smith and [Watts]," and "failed to fully investigate obvious suspects." Watts points to the fact that an anonymous caller reported that Dean told her that if she purchased drugs from someone else, "he would kill her like he did [the victim.]" What the caller said that Dean said, however,

was, "I'll kill you like [the victim]," not that he actually killed the victim. Nonetheless, police investigated Dean. They obtained Dean's DNA, which did not match any of the samples collected from the crime scene. Further, Detective Diaz explained that police could not connect Dean to the murder through any of the other evidence. Therefore, Dean was excluded as a possible suspect.

{¶ 54} Watts further argues that the state's case relies predominantly on "metadata" obtained from cellular companies that merely suggested that Smith, Watts, and the victim "were in contact with each other," which he maintains was not surprising because they all used drugs. We would agree with Watts if the state had only presented the cell phone records, but the state also presented Belle and Harrah, who testified that Watts told them that he participated in the murder. Moreover, the cell phone records do not just show that Smith, Watts, and the victim were in contact with each other. They also show that the victim was in close contact with Smith and Watts in the days and hours preceding her murder.

{¶ 55} Thus, although the state did not present direct evidence that Watts aided and abetted Smith, it presented sufficient circumstantial evidence that he did. We further find, after reviewing the record and weighing the evidence and all reasonable inferences, considering the credibility of witnesses and determining whether the factfinder clearly lost its way in determining that Watts was guilty of aiding and abetting, we find that it did not.

{¶ 56} Accordingly, Watts's first and second assignments of error are overruled.

### III. Allied Offenses of Similar Import

{¶ 57} In his third assignment of error, Watts argues that the trial court erred when it did not merge his kidnapping and aggravated murder convictions. In his fourth assignment of error, he argues that his counsel was ineffective for stipulating that the offenses were not allied offenses. Watts contends that because his trial counsel stipulated that the kidnapping and aggravated murder offenses were not allied offenses, the trial court committed plain error.

{¶ 58} Pursuant to R.C. 2941.25(A), "[w]here the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one." However,

> [w]here the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

R.C. 2941.25(B).

{¶ 59} "At its heart, the allied-offense analysis is dependent upon the facts of a case because R.C. 2941.25 focuses on the defendant's conduct." *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 26. In *Ruff*, the Supreme Court held that if a defendant's conduct supports multiple offenses, the defendant can be convicted of all of the offenses if any one of the following is true: (1) the conduct constitutes offenses of dissimilar import or significance, (2) the conduct shows the

offenses were committed separately, or (3) the conduct shows the offenses were committed with separate animus or motivation. *Id.*, at paragraph three of the syllabus, citing R.C. 2941.25(B).

{¶ 60} Two or more offenses are of dissimilar import within the meaning of R.C. 2941.25(B) "when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Ruff* at paragraph two of the syllabus.

{¶ 61} When determining whether two offenses are allied offenses of similar import, we apply a de novo standard of review. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 28.

{¶ 62} Aggravated murder under R.C. 2903.01(B) provides:

> No person shall purposely cause the death of another  * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, trespass in a habitation when a person is present or likely to be present, terrorism, or escape.

{¶ 63} Watts was convicted of kidnapping under R.C. 2905.01(A)(3), which states sets forth the elements of kidnapping as: "[n]o person, by force, threat, or deception, * * * by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person * * * [t]o terrorize, or to inflict serious physical harm on the victim or another[.]"

{¶ 64} There is no question that Watts's conduct in this case supports his aggravated murder and kidnapping convictions. Therefore, we must determine if

any of the three *Ruff* factors are present such that the trial court could sentence Watts on both offenses.  In answering this question, we turn to a case that was decided over 40 years ago, *State v. Logan*, 60 Ohio St.2d 126, 397 N.E.2d 1345 (1979).  In *Logan*, the Supreme Court held the following:

> In establishing whether kidnapping and another offense of the same or similar kind are committed with a separate animus as to each pursuant to R.C. 2941.25(B), this court adopts the following guidelines:
>
> (a) Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions;
>
> (b) Where the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime, there exists a separate animus as to each offense sufficient to support separate convictions.

*Id.*, at the syllabus.

{¶ 65} Watts contends that any restraint of the victim was "merely incidental to her murder."  We disagree.  The facts established that the victim was severely beaten such that she "had many fractures" in her face.  It was so bad that the victim's facial bones had separated from the rest of her skull bones.  She also had injuries to her scalp, neck, chest, abdomen, both arms and legs, and her upper back.  She had bruises, scrapes, and abrasions all over her body.  Her nose and lips were sunken into her head due to the fact that the integrity of her face had been compromised.  She had a pattern of small "dimples" all over her body, leading the medical examiner

to think that the perpetrators may have used an iron to beat the victim. The victim also had a fracture to her "hyoid bone," which is a "u-shaped bone right above the larynx or the voice box," due to the "impact from a blow" or strangulation.

{¶ 66} Based upon the extent and severity of the victim's injuries, we agree with the trial court that Watts's restraint of the victim was prolonged such that there exists a separate animus sufficient to sustain separate convictions for kidnapping and aggravated murder. Therefore, Watts's aggravated murder and kidnapping offenses were not allied offenses of similar import, and Watts's trial counsel was not ineffective when he stipulated to the same.

{¶ 67} Watts's third and fourth assignments of error are overruled.

{¶ 68} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27

of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, PRESIDING JUDGE

SEAN C. GALLAGHER, J., and
MARY EILEEN KILBANE, J., CONCUR